CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

FEB 27 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| CHRISTOPHER SCOTT EMMETT, | CIVIL ACTION NO. 7:05cv00329 |
| *Petitioner,* | |
| v. | MEMORANDUM OPINION |
| WILLIAM PAGE TRUE, Warden, Sussex I State Prison, | |
| *Respondent.* | JUDGE NORMAN K. MOON |

Petitioner Christopher Scott Emmett was convicted of capital murder in a Virginia state court. After unsuccessfully challenging his conviction and sentence in state post-conviction proceedings, he now petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent, William Page True, has moved to dismiss. For the reasons stated in this opinion, the respondent's motion to dismiss must be granted.

## FACTS

Emmett was convicted by a Danville jury on October 10, 2001 for the murder of John Langley. In its mandatory post-conviction review, the Virginia Supreme Court described the facts of the case:

> Weldon Roofing Company employed Emmett and Langley as laborers for its roofing crews. During late April 2001, both men were assigned to a project in the City of Danville and shared a room at a local motel where the roofing crew was staying. On the evening of April 26, 2001, Emmett, Langley, Michael Darryl Pittman, and other members

1

of the roofing crew cooked dinner on a grill at the motel, played cards, and drank beer. During the course of the evening, Langley loaned money to Emmett and Pittman, who used the money to buy crack cocaine.

At approximately 11:00 p.m. that evening, Rainey Bell, another member of the roofing crew, heard a noise he described as "bang, bang" coming from the room Emmett and Langley shared. Shortly after midnight, Emmett went to the motel office and asked the clerk to call the police, saying that he had returned to his room, "seen blood and stuff ... and didn't know what had took place."

The police arrived at the motel at 12:46 a.m. on April 27, 2001 and accompanied Emmett back to his room. There they discovered Langley's dead body lying face down on Langley's bed beneath a comforter. Blood spatters were found on the sheets and headboard of Langley's bed, on the wall behind it, and on the wall between the bathroom and Emmett's bed. A damaged brass lamp stained with Langley's blood was discovered beneath Langley's bed.

In his initial statement to police, Emmett denied killing Langley. He stated that he had returned to the room and gone to bed. Emmett claimed to have discovered the blood and Langley's body later that night when he got up to use the bathroom. Observing what appeared to be bloodstains on Emmett's personal effects, the police took possession of Emmett's boots and clothing with his permission. Emmett suggested that the blood might be his own because he had injured himself earlier in the week. Subsequent testing, however, revealed that Emmett's boots and clothing were stained with Langley's blood. Later in the morning of April 27, Emmett voluntarily accompanied the police to the Danville police station. There he agreed to be fingerprinted and gave a sample of his blood. Emmett admitted to the police that he had been drinking and using cocaine on the previous evening. Over the course of the next several hours, Emmett related different versions of the events of the previous evening to the police. He first implicated Pittman as Langley's murderer, but ultimately Emmett told the police that he alone had beaten Langley to death with the brass lamp.

Emmett was given *Miranda* warnings and he gave a full, taped confession. Emmett stated that he and Pittman decided to rob Langley after Langley refused to loan them more money to buy additional cocaine. Emmett stated that he struck Langley five or six times with the brass lamp, took Langley's wallet, and left the motel to buy cocaine.

*Emmett v. Com.*, 264 Va. 364, 368-69 (2002).

2

## PROCEDURAL HISTORY

The jury found Emmett guilty, determined that the prosecution had proved the aggravating factors necessary for a capital conviction, and sentenced Emmett to death. Emmett waived his direct appeal, and the Virginia Supreme Court affirmed Emmett's capital conviction in its mandatory post-conviction review on September 13, 2002. Emmett filed a state petition for habeas corpus on May 23, 2003. The Virginia Supreme Court initially dismissed the habeas petition on June 4, 2004, but in its opinion regarding the dismissal found that the petitioner's trial counsel performed deficiently by failing to object to improper penalty phase verdict forms. The respondent petitioned for a rehearing, and over Emmett's objections, the state court set aside its June 4, 2004 order and ordered further briefing and argument. After reargument, the Virginia Supreme Court reinstated its June 4, 2004 order and upheld its finding of deficient performance. However, the court also found that this resulted in no prejudice to Emmett. The court denied Emmett's petition for rehearing, and he filed this habeas petition in federal court on August 31, 2005.

Emmett asserts nine claims in his habeas petition, which fall broadly into the categories of ineffective assistance of counsel, juror claims, and the unconstitutionality of the death penalty in Virginia. Specifically, he asserts that he is entitled to a writ of habeas corpus because:

(1) His trial counsel failed to request the assistance of a toxicologist or other substance abuse expert and failed to develop and present evidence regarding his intoxication during the offense;

(2) His trial counsel unreasonably failed to investigate and present relevant mitigating

3

evidence;

(3) His trial counsel unreasonably failed to object to improper and incomplete penalty phase verdict forms;

(4) His trial counsel unreasonably failed to investigate and present evidence in rebuttal to the Commonwealth's evidence of future dangerousness;

(5) His trial counsel unreasonably failed to object to the prosecutor's incorrect statement that 'life does not mean life.'

(6) The cumulative effect of these failures prejudiced him;

(7) The jurors in his trial were exposed to extraneous influences;

(8) The jury did not follow the court's instruction to refrain from using Emmett's failure to testify against him; and

(9) The death penalty in Virginia is unconstitutional.

All of these claims were presented to the state court and are thus exhausted under 28 U.S.C. § 2254(b).

Emmett filed his petition for habeas corpus on August 31, 2005. The respondent filed a motion to dismiss on October 4, 2005, and Emmett filed a response to that motion on November 14, 2005. Emmett also moved to have a mental health expert appointed on November 20, 2005; the respondent filed an opposition to that motion on November 20, 2005, and Emmett filed a response in support on December 9, 2005. The facts and issues in this case have now been exhaustively briefed, and the case is ripe for decision.

4

# PROCEDURALLY DEFAULTED CLAIM

Before reaching the merits of Emmett's claims, the Court must address his claim regarding the unconstitutionality of the death penalty in Virginia. The Virginia Supreme Court held that this claim was procedurally defaulted because it was raised at trial and could have been asserted on direct appeal. *See Slayton v. Parrigan*, 215 Va. 27, 30 (1974). *Slayton* holds that if an issue could have been raised at trial or on appeal and it was not, it may not later be raised in a habeas petition. *Id.*

Under the "adequate and independent state grounds" rule, federal courts may not entertain a habeas petition unless the petitioner previously complied with state procedures in exhausting state remedies. *Beck v. Angelone*, 113 F. Supp. 2d 941, 948 (E.D. Va. 2000) (citing *Harris v. Reed*, 489 U.S. 255 (1989)). Hence, if a state court denied a state habeas claim based on a rule of default that the state courts consistently apply, then the petitioner cannot obtain federal relief on the same grounds without showing cause and prejudice or actual innocence. *Id.* Emmett has not attempted to make this showing. The default rule stated in *Slayton v. Parrigan*, 215 Va. 27 (1974), that the failure to raise a claim at trial or on direct review bars state habeas review of it, is an adequate and independent state grounds for denial of federal habeas relief. *Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998).

Thus, if Emmett could have raised this claim on direct appeal, it is now procedurally defaulted. The petitioner argues, however, that he could not have raised this exact claim on appeal, and thus that the default is improper. He argues that the claim he raised in his state

5

habeas petition differed from the one raised at trial because it relied on a report which was not yet available at the time of his trial. He also alleges that the *Slayton* rule is not an adequate and independent state grounds because it is not strictly followed by Virginia courts.

Emmett claims that the death penalty in Virginia is unconstitutional because courts impose it in a random and arbitrary manner. It varies according to geography, race, and the economic status of the defendant, and in addition, the Virginia Supreme Court's proportionality review involves too narrow a definition of "proportionality." Emmett argues that he could not have raised this precise claim on appeal because one of the studies he relies on was unavailable at that time. In this study, the Joint Legislative Audit and Review Commission (JLARC) described the geographic disparity in capital convictions throughout the state and the Virginia Supreme Court's narrow definition of proportionality in the required proportionality review.

This argument is unpersuasive because that study was by no means the only basis for Emmett's claim that the death penalty in Virginia is unconstitutional. He relies on several studies, including an ACLU study describing the geographic and racial disparities in the death penalty in Virginia and a report describing error rates in capital cases (Liebman Report). Indeed, the JLARC study provides the sole support for only one aspect of Emmett's claim: the unfairness of the state proportionality review. Given the other grounds on which he argues the unconstitutionality of the death penalty, he clearly could have brought this claim even without the JLARC report.

In addition, the court in another case rejected a similar claim. *Lenz v. True*, 370 F. Supp. 2d 446, 494 (W.D. Va. 2005). There, the petitioner argued that his claim was not procedurally

6

defaulted under *Slayton* because he relied on the JLARC report in his state habeas petition, and that report had not yet been published during his direct appeal. The court rejected this argument, noting that the facts cited in the report were in existence and available upon a reasonably diligent search. *Id.*

As to Emmett's claim that *Slayton* default is not an adequate and independent state ground, he cites no precedent for this assertion, and the cases the Court is aware of are directly contrary to his argument. *See Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998)*; Beck v. Angelone*, 173 F. Supp. 2d 461, 473 (E.D. Va. 2000). Hence, the Court concludes that the petitioner's claim on this point is procedurally defaulted.

## CLAIMS ON THE MERITS

### Applicable Law

Section 2254 of Title 28 of the United States Code governs habeas petitions from state prisoners to federal court. Section 2254(d) provides that:

> An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim– (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

§ 2254(d). Section 2254(e)(1) also provides that a "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting this presumption . . . by clear and convincing evidence."

The Supreme Court has interpreted this statute to mean that federal courts must give a respectful reading to state courts' determinations, provided those determinations do not conflict with federal law or apply federal law in unreasonable ways. *Williams v. Taylor*, 529 U.S. 362, 386-87 (2000). State court judgments should be upheld unless, under the closest examination of the judgment, the federal court is firmly convinced that a federal constitutional right has been violated. *Id.* at 388. Under the "contrary to" clause in section 2254(d)(1), a federal court may not second guess the state court's determination unless the state court reached a conclusion opposite to that reached by the United States Supreme Court on a question of law, or the state court decided the case differently than did the United States Supreme Court on a materially indistinguishable facts. *Id.* at 405-06; *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "unreasonable application" clause, a federal court may grant a writ of habeas only if the state court identified the correct governing principal from the Supreme Court's decisions, but applied it unreasonably to the facts of the petitioner's case. *Id.*. An unreasonable application of the law is different from an incorrect application, and a federal court may not issue a habeas writ simply because it would decide the case differently than the state court. *Id.*

In addition, factual determinations by a state court are presumed correct absent clear and convincing evidence to the contrary under section 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Federal habeas courts must make the starting point of their analysis the state courts' determinations of fact, including those aspects of mixed questions that rest on findings of fact. *Williams*, 529 U.S. at 387. Where,

8

however, a petitioner has properly presented a claim to a state court and the state court does not address that claim, the standards of section 2254(d) do not apply, and the federal court reviews the claim *de novo. Weeks v. Angelone*, 176 F.3d 249, 263 (4th Cir. 1999).

**Claim 1:** Trial counsel failed to request the assistance of a toxicologist or other substance abuse expert and failed to develop and present evidence concerning Emmett's intoxication at the time of the offense

Emmett argues that his counsel was ineffective for failing to present evidence of his intoxication when he committed the murder. The Virginia Supreme Court addressed and rejected this claim, holding that Emmett had satisfied neither the performance nor the prejudice claims of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and thus had not shown ineffective assistance of counsel.

To show ineffective assistance of counsel under *Strickland*, a petitioner must show that (1) the defense attorney made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense because the errors were so serious as to deprive the defendant of a fair trial. 466 U.S. at 687. The proper standard for attorney performance is that of "reasonably effective assistance" under prevailing professional norms. *Id.* at 687-88. Judicial scrutiny of counsel's performance must also be highly deferential and must seek to avoid the distorting effects of hindsight. *Id.* at 689. Further, the defendant must affirmatively prove prejudice from counsel's errors. To prove prejudice, he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding would have had a different result. A reasonable probability is one sufficient to undermine confidence in the case's outcome. *Id.* at 694.

9

The Virginia Supreme Court ruled that Emmett failed to show a particular need for expert assistance or that he was prejudiced by its absence. The court stated that Emmett's attorney had made a strategic decision not to assert a voluntary intoxication defense, and that there was no evidence as to the precise amount of alcohol and cocaine Emmett had consumed, thus making any expert testimony conjectural. Additionally, the court noted that Emmett's attorney argued at sentencing that Emmett was addicted to alcohol and cocaine and these addictions overwhelmed his judgment; thus, presumably, the jury was aware of and could consider Emmett's substance abuse problems.

The petitioner argues that section 2254(d) does not limit this Court's ability to grant relief on this point, because the Virginia Supreme Court did not adjudicate his actual claim on the merits. It rather adjudicated a claim he did not raise, by treating his claim as an assertion that counsel should have presented a voluntary intoxication defense. In fact, Emmett argues, he had specifically disavowed a voluntary intoxication defense. His defense was not that he was incapable of premeditating the murder, bur rather that he simply *did not intend* to kill Langley and that evidence about his intoxication would have supported that defense. Hence, he argues that he is entitled to *de novo* review on this point.

The petitioner also argues that to the extent the Virginia Supreme Court did adjudicate his actual claim, its decision was an unreasonable application of *Strickland* because it failed to consider whether trial counsel's actions and decisions were reasonable "considering all the circumstances" of the case. *See Strickland*, 466 U.S. at 688. Emmett further argues that the Virginia Supreme Court's decision was unreasonable under section 2254(d)(2) because its finding that there was insufficient evidence as to the amount of alcohol and cocaine he had

10

consumed was erroneous in light of the evidence adduced at trial. Further, its suggestion that counsel's argument regarding Emmett's addictions obviated the need for expert testimony was contrary to and an unreasonable application of *Wiggins v. Smith*, 539 U.S. 510, 526 (2003).

The petitioner's argument for *de novo* review of this claim must fail. Although Emmett does not say so in so many words, he appears to be arguing that he was too intoxicated to know how hard he was hitting Langley, or that his intoxication somehow led him to kill where he only meant to rob.[1] However, it appears that he misunderstands Virginia law on evidence of intoxication. Generally, voluntary intoxication is not an excuse for any crime. *Lilly v. Com.*, 255 Va. 558, 578 (1998), *reversed on other grounds, Lilly v. Virginia*, 527 U.S. 116 (1999); *Wright v. Com.*, 234 Va. 627 (1988). Evidence of intoxication may only be used to negate the specific intent for capital or first-degree murder, and a defendant's state of intoxication, however great will not "repel an inference of malice, implied by the circumstances surrounding his conduct." *Essex v. Com.*, 228 Va. 273, 281-82 (1984). In other words, in determining whether malice exists, the fact-finder must consider only the quality of the defendant's conduct, its likelihood of causing death or great bodily harm, and whether it was volitional or inadvertent; the defendant's level of intoxication does not enter into this calculus. *Id.* at 282. Voluntary intoxication cannot be used to disprove malice. *Swisher v. Com.*, 256 Va. 471, 488 (1998).

Emmett was not attempting to argue that he was too intoxicated *to be able* to premeditate

---

[1] In his habeas petition, Emmett notes that at trial, the prosecution argued that his claim that he did not intend to kill Langley was implausible given that he struck Langley five to six times with a brass lamp. In response, Emmett states in his brief, "However, had the jury been advised of the effects of alcohol and cocaine, Emmett's explanation would have been more plausible because of the impairment of perception and judgment that is caused by alcohol and cocaine intoxication." Pet. for Habeas Corpus, at 30.

11

or intend to kill, the narrow defense for which evidence of intoxication is allowed. Rather, he appears to be arguing that evidence of his intoxication would have rebutted evidence of malice; that he hit Langley on the head not intending to kill him, but that his intoxication altered his perceptions and judgment. Given Virginia's stringent limits on intoxication as a defense, it seems most unlikely that expert testimony would be admitted for this purpose during the guilt phase of trial. In discussing the voluntary intoxication defense, then, the Virginia Supreme Court was addressing the *only* defense for which expert testimony of intoxication would be admissible. The court ruled that Emmett's trial counsel made a strategic decision not to assert this defense and thus properly addressed Emmett's claim.

The petitioner also argues that counsel's argument at sentencing regarding how Emmett's addictions to alcohol and crack overwhelmed his judgment actually heightened counsel's duty to provide factual support for this claim. Emmett bases his argument on *Wiggins v. Smith*, 539 U.S. 510, 526 (2003). In *Wiggins*, the defendant's attorney said in his opening statement that the jury would hear how the defendant had had a difficult life, but he never followed up on that suggestion with details of the defendant's history. *Id.* The Supreme Court condemned this "shotgun" approach. *Id.*

Emmett's case presents a different situation, however. Here, there was evidence before the jury of how Emmett had changed after he became addicted to alcohol and cocaine, App. to Pet. for Habeas Corpus, vol. I, at 105-110 (hereinafter App.), and Emmett's statement to the police, which was played for the jury, disclosed that he had drunk over a twelve-pack of beer and smoked about "a sixteenth" of crack before the crime. Hence, counsel's statement in this case does not suffer from the same offhand and unprepared approach that the Supreme Court

12

criticized in *Wiggins*, but rather was built on evidence in the record of Emmett's alcohol and drug use.[2] Thus, this case is factually distinguishable from *Wiggins*, and Emmett's claim regarding the necessity of expert testimony in mitigation also fails.

The petitioner's argument that the Virginia Supreme Court failed to consider all the circumstances of the case and thus unreasonably applied *Strickland* also fails. *Strickland* requires that, in considering the "performance" prong of the ineffectiveness of counsel inquiry, the court examine whether counsel's actions were reasonable considering all of the case's circumstances. 466 U.S. at 688. Emmett does not elaborate on what circumstances he believes the court failed to consider, and the Virginia Supreme Court's opinion shows that it considered the petitioner's own statements of premeditation as well as the opinion of his court-appointed expert in determining that his counsel's performance was not deficient. Although the Virginia Supreme Court did not say in so many words that it had "considered all the circumstances," neither is it required to do so. *See Weeks v. Angelone*, 176 F.3d 249, 259 (4th Cir. 1999); *Lenz v. True*, 370 F. Supp. 2d 446, 465 (W.D. Va. 2005). An examination of the Virginia Supreme Court's decision does not show it to be an unreasonable application of *Strickland*.

Finally, the Supreme Court's finding that evidence of Emmett's alcohol and drug consumption that night was too vague to support expert testimony was not objectively

---

[2]In addition, at least one court has held that intoxication does not ordinarily require expert testimony, *see Reid v. Taylor*, 2002 U.S. Dist. LEXIS 17862 (W.D. Va. Sept. 23, 2002), and the Fourth Circuit has noted that evidence of drug or alcohol abuse may be the type of evidence that supports, rather than contradicts, a finding of future dangerousness. *Giarratano v. Procunier*, 891 F.2d 483, 490 (4th Cir. 1989). In light of these cases, the Virginia Supreme Court's conclusion was certainly reasonable that Emmett's counsel was not ineffective for failing to call a substance abuse expert.

13

unreasonable. In his statement to the police, Emmett stated that he had had "over a twelve pack" of Natural Ice beer and " 'bout a sixteenth" of crack cocaine, although he was uncertain of this amount. App. at 29. Given that the quantities he consumed remain somewhat vague, the Virginia Supreme Court's determination was not objectively unreasonable. In sum, the Virginia Supreme Court's adjudication of this claim was not contrary to clearly established federal law, nor was it an unreasonable determination in light of the evidence. Further, because the Virginia court addressed Emmett's claim, section 2254(d) does indeed govern this Court's decision.

**Claim 2**: Trial counsel unreasonably failed to investigate and present relevant mitigating evidence

Emmett argues that his trial counsel was ineffective for failing to introduce evidence of his difficult childhood as mitigation. If introduced, this evidence would have shown that his mother neglected him and his siblings, that he did not receive adequate food, clothing, or hygiene, and that he was sometimes abused by his older siblings. He was diagnosed with an attachment disorder, and his mental health records show a tendency to be preoccupied with basic survival needs, especially food, because of his malnourishment early in life. Emmett argues that if this mitigation evidence had been before the jury, it would not have sentenced him to death.

The Virginia Supreme Court held that this claim satisfied neither the performance nor the prejudice prongs of *Strickland*. The record shows that Emmett never informed his counsel of his troubled upbringing. He told his court-appointed mental health expert that he got along with his stepfather, and that his mother was a loving mother who rearranged her schedule to take care of him. The Virginia court also stated that Emmett's counsel interviewed all of the witnesses

14

provided by Emmett, and none of them reported any problems during his childhood. The court also held, relying on *Strickland*, that counsel cannot be found ineffective for relying on information provided by his client. The court noted that counsel did not pursue petitioner's mental health records because neither petitioner nor his family members gave any indication that there was anything useful in them. Although counsel spoke to one juvenile probation officer who told him that petitioner lived in "nasty-dirty trailers [with] lots of kids and not much attention," counsel made a strategic decision not to call her as a witness because doing so would allow introduction of petitioner's juvenile criminal history. The court concluded that counsel was not ineffective for failing to present such "cross-purpose" evidence. The court also specifically stated that in finding no prejudice to petitioner, it had weighed the aggravating evidence against the mitigating evidence, as required by *Wiggins v. Smith*, 529 U.S. 510 (2003).

The petitioner argues that section 2254(d) does not bar relief on this point because the Virginia Supreme Court's central holding on this claim was contrary to or an unreasonable application of clearly established Supreme Court precedent under *(Terry) Williams v. Taylor*, 529 US 362 (2000); *Rompilla v. Beard*, 125 S. Ct. 2456 (2005)[3]; and *Wiggins v. Smith*, 539 U.S. 510 (2003). All of these cases deal with situations where counsel failed to research or present mitigating evidence. All of these cases are factually distinguishable from Emmett's situation, however. *Rompilla* deals with a situation where trial counsel failed to look at the prosecution's file, which was kept at the courthouse and which he was on notice the state would use at

---

[3]It is worth noting that *Rompilla* was decided after the Virginia Supreme Court's decision in this case. Thus, to the extent that it offers new rules, they were not "clearly established" federal law when this case was before the Virginia Supreme Court.

sentencing. The Court specifically distinguished that situation from the hypothetical case where a lawyer fails to pursue leads in school records or among juvenile records when he has no reason to believe these would be helpful in the case before the court. *See Rompilla*, 125 S. Ct at 2467. The latter situation is factually much closer to Emmett's circumstances, given that Emmett himself gave no indication that his childhood contained any useful mitigating evidence.

Similarly, in *Wiggins*, the defense found no information that indicated to them that a mitigation case would be fruitless; the Court distinguished other cases where such evidence had emerged. *Wiggins,* 539 U.S. at 525-26. Here, counsel had information from Emmett himself suggesting that his early life was unremarkable. The counsel in *Wiggins* never asked about pertinent mitigation evidence, such as the petitioner's sexual abuse, *id.* at 532, whereas here counsel did inquire into Emmett's background. Further, *Williams v. Taylor* states that it does not change the test the Court should use, but rather applies *Strickland.* 529 U.S. at 390. And *Strickland* explicitly states: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. Indeed, when a defendant has "given counsel reason to believe that pursuing certain investigations would be fruitless . . . counsel's failure to pursue those investigations may not be later challenged as unreasonable." *Id.* Here, Emmett himself indicated both to counsel and to his court-appointed mental-health expert that his early home life was unremarkable.

Nor does the Virginia Supreme Court's apparently mistaken statement that Emmett's trial counsel interviewed all of the witnesses Emmett provided contaminate its decision. *Strickland* does not require counsel to pursue "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

16

Thus, given the information Emmett's counsel had uncovered, he was not required to interview all of the witnesses Emmett mentioned. Hence, this statement does not alter the overall reasonableness of the Virginia Supreme Court's decision on this claim.

The petitioner also argues that other aspects of the Virginia Supreme Court's decision are contrary to and unreasonable applications of clearly established federal law. Specifically, he objects to the court's determination that counsel made a reasonable strategic decision not to call Emmett's juvenile probation officer when doing so would allow the introduction of evidence on Emmett's criminal background. In *Strickland*, the court noted that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Here, although it is clear that Emmett's counsel *could have* conducted further investigation, he was not *required* to, as discussed above. Hence, the Virginia court's determination that counsel made a proper strategic decision is not contrary to or an unreasonable application of *Strickland*.

Emmett also objects to the Virginia Supreme Court's holding that his counsel was not ineffective for failing to present evidence that could be used in aggravation as well as mitigation; he argues that the mitigating aspects of the evidence so far outweighed the aggravating aspects that this determination was contrary to and unreasonable in light of *(Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000). The inquiry here is highly factual, however, and the facts of *Williams* vary from the petitioner's situation. In *Williams*, the petitioner was borderline mentally retarded, and his earlier encounters with the justice system had apparently produced a significant number

17

of accolades as to his good character and amenability and ability to thrive in a prison environment. *Id.* In contrast, there is no allegation here that Emmett suffers from mental retardation or that he would benefit from incarceration. Although the comments of his juvenile probation officer and others might serve to shed light on his difficult childhood, they also reveal that Emmett's criminal history began at age seven. Given that Emmett's future dangerousness was at issue, as the Virginia Supreme Court noted, and that this evidence might tend to show his future dangerousness much more than the unintroduced mitigation evidence in *Williams* would have, the Virginia court's holding was not contrary to or an unreasonable application of federal law.

**Claim 3** - Trial counsel unreasonably failed to object to improper penalty-phase verdict forms

Emmett also argues that he was denied effective assistance of counsel when his attorney failed to object to the verdict forms used in the penalty phase of his trial. These forms, Emmett contends, did not give the jury the option of sentencing him to life in prison after finding that neither aggravating factor had been proven; rather they allowed the jury to find either or both aggravating factors and sentence him to death, or find either or both aggravating factors and sentence him to life in prison. Emmett argues that this failure constitutes structural error, and thus that the *Strickland* standard does not apply.

The Virginia Supreme Court rejected Emmett's argument that using the improper verdict forms was structural error after examining the cases where the United States Supreme Court had

18

found such errors and the cases where it had used only a harmless error analysis. The Virginia Supreme Court then determined that this claim satisfied the performance but not the prejudice prong of *Strickland*: although Emmett's counsel was deficient in failing to object to the verdict forms, the failure had no actual prejudicial effect, because the jurors found both aggravating factors and sentenced Emmett to death. The Virginia Supreme Court later vacated its ruling on this issue, granted a rehearing, and then reinstated its ruling.

The petitioner first argues that the Virginia Supreme Court's rejection of his structural error argument was contrary to and an unreasonable application of existing United States Supreme Court precedent. He argues that the state court's decision turned on the determination that the defective verdict form "did not vitiate all the jury's findings," as discussed in *Sullivan v. Louisiana*, 508 U.S. 275 (1993). The court applied an incomplete definition of structural error, Emmett claims, because an error need not vitiate all of the jury's findings to be structural error. In support of this proposition, he cites, inter alia, *Tumey v. Ohio*, 273 US 510 (1927) (structural error for a biased judge to preside at trial); *Waller v. Georgia*, 467 U.S. 39 (1984) (structural error where the defendant was denied the right to a public trial); and *Vasquez v. Hillery*, 474 U.S. 254 (1986) (structural error where racial discrimination influenced grand jury selection). Emmett argues that the error in his case is structural because the failure to provide proper verdict forms affects the overall manner in which jury receives and considers evidence, as well as the manner in which it expresses its findings

Emmett also argues that the court misconstrued the prejudice prong of *Strickland* by using a prohibited "outcome-determinative" analysis, rather than considering whether there was simply a reasonable probability that, but for counsel's error, the proceeding's result would have

19

been different. Emmett further argues that the court's analysis was also unreasonable because it failed to consider whether the available verdict forms colored the jury's findings.

If the defendant had counsel and was tried by an impartial adjudicator, there is a "strong presumption" that any constitutional errors that may have occurred are subject to the harmless error analysis. *Rose v. Clark*, 478 U.S. 570, 579 (1986). The Supreme Court has only found structural error in a very limited number of cases, and generally, those errors have involved infringements on the basic protections offered by the trial process. *See Gideon v. Wainwright*, 372 U.S. 335 (1963) (deprivation of the right to counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (trial by a biased judge); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (right to self-representation). Structural errors infect the trial process itself and necessarily render the trial fundamentally unfair. *Neder v. U.S.*, 527 U.S. 1, 8 (1999) (citations omitted).

Emmett argues that the court's finding was unreasonable because it relied on an incomplete definition of structural error: whether the claimed error vitiated all of the jury's findings. Although the Virginia Supreme Court noted that this error did not vitiate the jury's findings, it also cited the Supreme Court for the proposition that, "unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. U.S.*, 527 U.S. 1, 9 (1999) (emphasis in original). The Virginia Supreme Court's understanding of structural error was thus not incomplete, and it was aware of cases akin to those cited by Emmett, where structural error was present but in which the jury's decision itself was not "vitiated." In the present case,

20

however, the jury's decision was at issue, and the court reasonably looked to Supreme Court cases related to the validity of jury verdicts. Emmett's references to cases involving biased judges or juries subject to race discrimination thus have little bearing. Other than citing them as examples of cases where the error did not vitiate all of the jury's findings, Emmett offers no explanation of how they illuminate this case. There is a wealth of Supreme Court precedent on constitutional error in jury trials, and the Virginia Supreme Court surely cannot be faulted for relying more closely on the more relevant cases.

Under *Sullivan v. Louisiana*, 508 U.S. 275 (1993), the Supreme Court discussed the distinction between the harmless error and structural error analyses. The harmless error analysis looks to the basis on which the jury actually rested its verdict, and asks whether the guilty verdict *in this trial* is surely unattributable to error. *Id.* at 279. The Court applied the structural error analysis in *Sullivan* because the jury was given a defective reasonable doubt instruction, and thus there was no valid jury verdict on which to hang the harmless error analysis. *Id.* at 280. The defective reasonable doubt finding vitiated all of the jury's findings. *Id.* In contrast, in *Neder v. U.S.*, 527 U.S. 1, 9 (1999), the Supreme Court held that a jury instruction which omits an element of the offense does not necessarily render the trial unfair. Indeed, the Court in *Neder* noted that harmless error was often applied to faulty jury instructions. *Id.* Given these Supreme Court cases as well as others considering structural and harmless error, it seems clear that the Virginia court's holding was neither contrary to established Supreme Court law nor an unreasonable application of that law to the facts.[4]

_____

[4]Despite Emmett's emphasis on whether the jury would have found the aggravating factors if it had had the proper verdict form, the correct inquiry seems instead to be whether it

Similarly, the Virginia court's application of the prejudice prong of *Strickland* was reasonable and conformed to established Supreme Court precedent. Although Emmett accuses the court of applying a more demanding standard than *Strickland* requires, in fact the court explicitly quoted the proper standard in its opinion: "We once again conclude that Emmett has failed to show that 'there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' Strickland, 466 U.S. at 649." The court thus did not apply the prohibited "more likely than not" standard, and reasonably applied the prejudice prong of *Strickland*.

As to Emmett's argument that the Virginia Supreme Court should have considered whether the available verdict forms colored the jury's findings, this analysis is implicit in the second prong of *Strickland*. The court stated that it applied *Strickland*'s analysis and found that Emmett had failed to show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Given that the jury still had the opportunity to sentence Emmett to life in prison, and yet instead sentenced him to death, this Court cannot say that the Virginia Supreme Court's decision was contrary to the law or unreasonably applied the law to the facts of this case.

**Claim 4:** Trial counsel unreasonably failed to investigate and present evidence in rebuttal to the

---

would have sentenced Emmett to death. Notably, the verdict forms which the jury did have gave it the option of sentencing him to life in prison as well as to the death penalty. The jury thus had both options before it, and could plainly have found both or only one of the aggravating factors and given Emmett a life sentence. *See* App., at 115-17 (providing a transcript of the jury instructions). The fact that both sentencing options (life imprisonment and the death penalty) were available makes the argument centered on aggravating factors something of a red herring.

Commonwealth's evidence of future dangerousness

In a drunk driving accident before Emmett's trial, Emmett drove the wrong way onto an on ramp and killed a motorcyclist. The Commonwealth used evidence regarding the accident as part of its case in aggravation and presented evidence tending to show that Emmett was unconcerned and possibly even cheerful after the event. Emmett argues that his counsel was deficient in failing to present evidence of his remorse after the accident.

The Virginia court held that this claim satisfied neither the performance nor the prejudice prongs of *Strickland*. The evidence the Commonwealth presented showed Emmett grinning broadly after the accident, and the arresting officers testified that he was "apathetic," "very light hearted," and had no concern for the person he had killed. The Virginia Supreme Court found that Emmett's counsel could not have reasonably rebutted this evidence of Emmett's demeanor immediately after the accident with evidence of his remorseful statements to family some time after the event.

Emmett argues that the Virginia Supreme Court's determination that he could not reasonably have rebutted the prosecution testimony was contrary to and an unreasonable application of existing Supreme Court precedent, including *Skipper v. South Carolina*, 476 U.S. 1 (1986), *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Gardner v. Florida*, 430 U.S. 349 (1977). Under *Skipper*, in capital cases the sentencer may not be precluded from considering any potentially mitigating evidence. 476 U.S. at 8-9. Emmett argues that the Virginia court's holding here was directly contrary to *Skipper*. If the Virginia court's approach were used, Emmett states, it would mean that a defendant could only offer evidence to rebut the prosecution's specific

23

factual allegations and not the conclusions and arguments the Commonwealth attempts to draw from those facts.

Emmett argues that the mitigation evidence his counsel failed to present would have shown he was deeply remorseful, and would have created a reasonable probability that the jury would have exercised mercy. Evidence his trial counsel could have presented included testimony by his mother that he came home and cried after the accident and that he said he didn't know how he could live with what he had done. His girlfriend at the time also said he cried about the accident several weeks later. Emmett's counsel had notice that the prosecution would present aggravating evidence about this accident, but failed to investigate this evidence to rebut it. If this evidence had been presented, Emmett argues, there is a reasonable probability the jury would have given him a life sentence.

Emmett is correct that under *Skipper* a defendant has a due process right to present mitigating evidence. *See* 476 U.S. at 8-9. However, as the respondent notes in his reply brief, the Virginia Supreme Court did not hold that the evidence Emmett sought to introduce was inadmissible, but rather that it was inadequate. The court stated, "Counsel could not have *reasonably* rebutted the Commonwealth's evidence of petitioner's demeanor immediately following the accident with supposed evidence of petitioner's remorse some time after the accident." (emphasis added). The use of the word "reasonably" indicates that the adequacy of the evidence, not its admissibility, was at issue.

The Virginia Supreme Court's holding on this claim was not contrary to or an unreasonable application of *Strickland*. In determining prejudice, the court was required to

24

evaluate the mitigation evidence available, including that adduced in the habeas proceeding, and weigh it against the evidence in aggravation. *Williams,* 529 U.S. at 397-98. The Virginia Supreme Court did just that, weighing the potential testimony of Emmett's mother and girlfriend against that of the arresting officers at the vehicular homicide scene and the picture of Emmett smiling after the accident. In finding that the proposed testimony was insufficient to rebut the Commonwealth's aggravation evidence, the Virginia Supreme Court properly determined that there was no prejudice to the petitioner under *Strickland,* and thus that he was not entitled to relief on this claim. The court's determination was neither contrary to nor an unreasonable application of federal law.

**Claim 5**: Emmett's trial counsel unreasonably failed to object to the prosecutor's incorrect statement that 'life does not mean life.'

Emmett argues that his counsel was ineffective for failing to object to the prosecutor's statements in his closing that if Emmett were sentenced to life in prison, he would not necessarily be incarcerated for the rest of his life. The statement to which Emmett objects occurred during closing, when the Commonwealth's Attorney stated, in part, "And don't believe all this glib talk about life without parole . . . that's just talk."

The Virginia Supreme Court held that this claim met neither the performance nor the prejudice prongs of *Strickland.* The prosecutor never told the jury, as Emmett alleges, that 'life does not mean life.' Rather his statement, quoted above, was in the context of demonstrating Emmett could still be dangerous, even in prison. The prosecutor's statement continued, "People

25

escape from jail. This man has escaped from jail. He has nothing to lose . . ." Emmett's claim on this point thus fails both of the *Strickland* prongs, the Virginia Supreme Court held.

Emmett argues that the Virginia court's holding on this claim was based on an unreasonable determination of the facts in light of the law under section 2254(d)(2). Specifically, the finding that "the Commonwealth never told the jury that 'life does not mean life'" is unreasonable in light of the prosecutor's own words. The state court merely ignored this improper argument and focused on other portions of the closing, Emmett contends.

Emmett argues that the prosecutor's statement left the jury with the legally incorrect impression that if Emmett were sentenced to life in prison, he might some day be released on parole. The United States Supreme Court has held that where future dangerousness is at issue, the sentencing jury must be told if the defendant is parole-ineligible. *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994). Emmett argues that a reasonable defense counsel would have objected to this comment and moved for a mistrial. If he had done so, there was a reasonable probability Emmett would have been given a new sentencing hearing.

The jury may legitimately consider evidence of a defendant's future dangerousness during the sentencing phase of the trial. *Simmons v. South Carolina*, 512 U.S. 154 (1994). However, the jury must be informed if the defendant is parole-ineligible where future dangerousness is at issue. *Id.* Here, it is clear that the jury was so informed. Before closing, the trial court instructed the jury that "the words 'imprisonment for life,' mean imprisonment for life without possibility of parole." App., at 117-18. Further, defense counsel in his closing emphasized that Emmett would have no possibility of parole if he received a life sentence. App., at 128. In his rebuttal, the

26

prosecutor stated:

> [T]hey can talk about deterrence all they want to, but there's one thing for sure . . . when a murderer is sentenced to death and he is executed, he can never kill again. It is that deterrence. And don't believe all this glib talk about life without parole . . . that's just talk. People escape from jail. This man has escaped from jail. He has nothing to lose . . . [T]hink about the guards . . . [T]hink about his cellmate . . . we submit he's a future danger, even with life without parole, because he's going to have a lot of interaction with a lot of people, and nothing to lose.

App., at 154. The Court must presume that the state court's factual determinations are correct absent clear and convincing evidence to the contrary. *Wiggins,* 539 U.S. at 528. This includes determinations made by state courts in post-conviction proceedings. *Howard v. Moore,* 131 F.3d 399, 422 (4th Cir. 1997). Further, a decision based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence at the state court proceeding. § 2254(d)(2); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003). Given the full statement, the Virginia court's decision on this point is not an unreasonable determination of the facts. Placed in its proper context, it is clear that the statement refers to Emmett's future dangerousness even without access to parole.

Further, the petitioner cites no authority for the proposition that a jury cannot consider the future dangerousness of an imprisoned defendant. Indeed, in *Watkins v. Angelone,* the Fourth Circuit discussed without comment the Commonwealth's presentation of evidence on the defendant's future dangerousness even if he were incarcerated. 133 F.3d 920 (4th Cir. 1998) (unpublished). *See also U.S. v. Bodkins,* 2005 WL 1118158 (W.D. Va. 2005) ("the potential for future dangerousness solely in the prison context is relevant at sentencing"); *U.S. v. Bernard,* 299 F.3d 467, 482 (5th Cir. 2002) ("*Simmons* does not hold that future dangerousness is irrelevant to

27

a jury's sentencing decision when the defendant will be imprisoned indefinitely.")

Hence, it appears that the Virginia court acted reasonably on this issue, and petitioner's argument here fails.

**Claim 6 -** The cumulative effect of these failures prejudiced Emmett

Emmett argues that the cumulative effect of the errors described above left the jury with an inaccurate, incomplete, and unsympathetic impression of him; if counsel had not made these errors, Emmett would not have received a death sentence. The Virginia Supreme Court found this claim meritless. The cumulative effect of acts or omissions which themselves do not constitute ineffective assistance does not create a valid ineffective assistance claim under *Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998), it held.

Emmett argues that the Virginia court's determination is contrary to United States Supreme Court precedent because *Fisher v. Angelone* was effectively overruled by *(Terry) Williams v. Taylor*, 529 U.S. 362 (2000), in which the Supreme Court faulted the state court for failing to consider the cumulative effects of counsel's deficient performance.

In *Williams v. Taylor*, the Supreme Court ruled that the Virginia court erred in failing to evaluate the totality of mitigation evidence available. 529 U.S. 362, 398-99 (2000). In applying *Williams*, however, the Fourth Circuit has held that it is "not appropriate to consider the cumulative effect of attorney error when the individual claims of ineffective assistance do not violate the defendant's constitutional rights." *U.S. v. Russell*, 34 Fed. Appx. 927, 927 (4th Cir.

28

2002) (unreported) (citing *Fisher*, 163 F.3d at 852). Further, Judge Jones held, in *Lenz v. True*, that several ineffective assistance of counsel claims, none of which constitutes deficient performance or prejudice, cannot collectively prejudice a defendant. 370 F. Supp. 2d 446, 490 (W.D. Va. 2005). Here, only one of Emmett's claims showed actual deficience on the part of his counsel, and none reached the level of prejudice. Hence, there is nothing for the court to cumulate, and the Virginia court's ruling on this point was not contrary to established federal law.

**Claim 7 -** The jurors in Emmett's trial were exposed to extraneous influences

Emmett argues that the jurors were exposed to extraneous influences outside the trial record because during deliberations, at least one juror claimed to have specific knowledge about the effects of crack cocaine on a person's mental state. The juror's description of crack's effects amounted to "expert" testimony, Emmett argues. The juror's statement during deliberations denied Emmett his right to counsel, his right to be present during a critical stage of the proceedings and to confront the evidence against him, his right to an impartial jury, and his right to a fair and reliable determination of his sentence, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.

The Virginia Supreme Court ruled that the issue presented by Emmett's claims regarding the juror's statement was whether he had alleged sufficient facts to warrant an evidentiary hearing on the issue. The court noted that Virginia tends to protect the secrecy of jury

29

deliberations and has limited findings of prejudicial misconduct to the activities of jurors outside the jury room or to the potential effects of extraneous material brought in to the jury room. The court concluded that jurors will bring their experiences and knowledge to their deliberations and may express opinions on the evidence based on their viewpoints. Hence, the Virginia Supreme Court held that the juror only expressed such an opinion, and thus that Emmett has not alleged sufficient facts to warrant an evidentiary hearing.

Emmett argues that the state court's adjudication involved an unreasonable application of, or was contrary to, *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954). The Virginia Supreme Court failed to cite these cases, and its decision that the juror's opinion was not extraneous was contrary to established law. Emmett cites a number of cases where courts found a juror's statements constituted extraneous evidence. *See, e.g., Gibson v. Clanon*, 633 F.2d 851 (9th Cir. 1980); *Hard v. Burlington Northern R.R.*, 812 F.2d 482 (9th Cir. 1987); *Gov't of the Virgin Islands v. Gereau*, 523 F.2d 140 (3rd Cir. 1975). He also argues that had the juror in his case referred to a medical text for the effects of crack cocaine, this would have been an impermissible external contact; hence, it makes no sense to allow this statement merely because it came from a juror. Under *Turner*, the evidence used by the jury must have been developed at trial.

Emmett argues that it is well established that the complete denial of counsel during a critical phase of a judicial proceeding mandates the presumption of prejudice. Jury deliberations are a critical stage of the proceedings for Sixth Amendment purposes, he argues. Where one of the jurors provided information that an expert would have offered in court, Emmett was deprived of his right to know the jury questions and offer a response.

30

In addition, Emmet argues that a juror's verdict in a criminal case must be based solely on the evidence before it and not on extraneous material. The evidence regarding the effects of crack was extrinsic because it was not part of the trial record, presented by a witness, or part of the court's instructions. Emmett was also denied his right to be present during a critical part of the trial, he argues. Because "expert" testimony was offered during the deliberations, he was denied his right to be present, and had no chance to correct, mitigate, or rebut the "expert" testimony.

Emmett's reliance on *Turner* and *Remmer* is misplaced as both cases deal with situations where jurors received information from or had conversations with individuals not on the jury. *Turner* deals with a situation where two sheriffs, who were key witnesses for the prosecution, had charge of the jury and fraternized with them during the three day trial. 379 U.S. 466, 472-73 (1965). Similarly, in *Remmer*, an unnamed person told a juror during the course of the trial that the juror could profit by bringing a verdict for the defendant. 347 U.S. 227, 228-230 (1954). Clearly, these cases differ factually from Emmett's. Here, all of the "extrinsic" evidence came from within the jury itself, and there is no allegation that anyone tampered with the jury or that any individual outside the jury may have improperly swayed its verdict.

Emmett, however, reads these cases to mean that only information admitted as evidence may be considered by the jury in its deliberations. In that respect, however, he takes too narrow a view of the information a jury can consider. Courts generally agree that a juror's past personal experiences may be an appropriate part of the jury's deliberations, and jurors must inevitably rely on those experiences in formulating their verdict. *See, e.g., U.S. v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991). As the Supreme Court has noted in the context of jury evaluation of expert testimony, "So far from laying aside their own general knowledge and ideas, the jury

31

should have applied that knowledge and those ideas to the matters of fact in evidence . . . they may, and to act intelligently they must, judge the weight and force of that evidence by their own general knowledge of the subject of inquiry." *Head v. Hargrave*, 105 U.S. 45, 49 (1881). A juror's personal experience may constitute extrinsic evidence, however, where the juror has personal knowledge of the parties or issues at stake. *Navarro-Garcia*, 926 F.2d at 821.

As the respondent notes, almost all of the cases cited by Emmett deal with situations where the evidence at issue truly was extrinsic: it came either from books or papers outside of the evidence, or from contacts with non-jurors. In the only federal case[5] Emmett cites where the information came from the jurors themselves, *Hard v. Burlington Northern Railroad*, 812 F.2d 482 (9th Cir. 1987), two jurors were former employees of the defendant. They described the defendant's settlement practices during jury deliberations, and the Ninth Circuit found this constituted extraneous evidence. *Id.* at 486. In that case, the jurors described the specific practices of that particular defendant; in contrast, here the juror offered only a general opinion on the effects of crack cocaine. There is no evidence that he knew Emmett, or was attempting to describe the drug's effects on him personally.

Emmett thus misinterprets the law on this issue; the Virginia court's decision was a reasonable one and conformed with established Supreme Court precedent.

---

[5]Emmett also cites two state court cases to support his position: *McDonald v. Southern Pacific Transport. Co.*, 71 Cal. App. 4th 256 (1999), and *Lumbermens Mutual Casualty Co. v. Cummings*, 618 S.W.2d 883 (Tx. 1981). Although both of these cases found jury misconduct when the jurors themselves offered information during deliberations, they are factually distinguishable from the instant case. More importantly, neither case purports to apply or interpret clearly established federal law as decided by the Supreme Court of the United States, and thus neither case has any bearing on the Virginia Supreme Court's holding here, given the strictures of section 2254(d).

32

**Claim 8:** The jury did not follow the court's instruction to refrain from using Emmett's failure to testify against him

Emmett offers the affidavits of several of his trial jurors, which state that some jurors commented on and discussed the fact that Emmett did not testify. They concluded that he seemed to have no remorse because he did not take the stand and apologize. The Virginia Supreme Court stated that it had examined the jury affidavits submitted, and it concluded that the jury merely discussed Emmett's lack of remorse. Rather than expressing the opinion that his failure to testify implicated his guilt, the jurors' discussion focused on how they wished he had shown remorse or testified during the penalty phase to apologize. Because evidence of remorse is a mitigating factor during penalty-phase deliberations, the Virginia Supreme Court held that it was proper for the jury to consider Emmett's lack of remorse.

Emmett argues the Virginia court's decision was contrary to and an unreasonable application of clearly established federal law, as well as an unreasonable determination of facts in light of the evidence. He states that although the jurors were instructed not to consider his failure to testify, they made repeated references to this fact during their deliberations. Emmett recognizes that a jury can properly consider a defendant's lack of remorse during sentencing, so long as it bases its consideration on evidence presented during trial. However, just as a jury cannot infer guilt from a failure to testify, he argues, it cannot infer lack of remorse from a failure to testify at sentencing.

No negative inference from a defendant's failure to testify is permitted. *Mitchell v. U.S.*, 526 U.S. 314, 329 (1999). This rule applies at sentencing as well as at the guilt phase of trial. *Id.* In *Carter v. Kentucky,* the Supreme Court discussed the requirement that a court give a "no-

33

inference" instruction when a defendant refuses to take the stand. 450 U.S. 288, 303 (1981). The opinion acknowledged that "[n]o judge can prevent jurors from speculating about why a defendant stands mute . . . but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum." *Id.*

The Fourth Circuit has held that a prosecutor can comment on the defendant's lack of remorse without implicating his right to remain silent where the prosecutor only discusses the defendant's demeanor at trial. *Bates v. Lee*, 308 F.3d 411, 421 (4th Cir. 2002). *See also Gaskins v. McKellar*, 916 F.2d 941 (4th Cir. 1990) (holding that it is not a comment on the defendant's right to silence under the Fifth Amendment to merely assert that he lacks remorse.); *Six v. Delo*, 94 F.3d 469 (8th Cir. 1996). In *Mitchell*, the Supreme Court expressly withheld judgment on the effect of the defendant's silence on the jury's determination of a lack of remorse. 526 U.S. at 330. Other circuit courts have considered the question, however. In *United States v. Romero-Rendon*, the Ninth Circuit discussed the effect of the defendant's decision to remain silent at his sentencing hearing and to offer no evidence to rebut the presentence report. 220 F.3d 1159 (9th Cir. 2000). That court held that *Mitchell* cannot be read to mean that a sentencer must ignore the absence of rebuttal evidence. *Id.* The court distinguished between drawing an adverse inference from a refusal to testify at sentencing, and recognizing that where the defendant has put forward no evidence, the government's evidence may be proof of the matter asserted. *Id.* Given that the Supreme Court declined to rule on this very issue and thus that there is no well-established federal precedent that contradicts the Virginia court's ruling, section 2254 requires that this Court hold the Virginia Supreme Court's decision was not contrary to or an unreasonable application of well-established federal law.

34

Nor was the Virginia court's determination of the facts in light of the evidence objectively unreasonable under section 2254(d)(2). The Virginia Supreme Court found that the jury merely discussed Emmett's apparent lack of remorse, and this determination is not objectively unreasonable given the affidavits. Juror Rita Adkins stated, "One thing that stood out to me was that Emmett did not ever say he was sorry or say anything. It didn't seem that he had any remorse." App., at 244. Juror James A. Hughes stated, "During our deliberations, we discussed the fact that [Emmett] did not testify. Some of us thought that it seemed like Emmett didn't even care about what he had done, because he did not address the jury or tell us that he was sorry." App., at 245. Jury foreman Steve Robertson said, "I specifically recall that Emmett seemed totally unmoved by the entire trial. He appeared to have no emotion or regret. He did not take the stand or offer any kind of remorse or apology for his actions. The jury discussed this fact." App., at 248. These statements do not compel the conclusion the Virginia Supreme Court reached, but neither do they render it objectively unreasonable. The jurors' focus was on the lack of evidence of remorse, rather than on any inference that Emmett's failure to testify implicated his guilt. Hence, Emmett's claim for relief based on section 2254(d)(2) fails.

## CONCLUSION

Having evaluated all of the petitioner's claims in support of his petition for a writ of habeas corpus, this Court has determined that section 2254 governs its analysis and that the Virginia Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence.

35

In light of this decision, this Court also finds that the petitioner is not entitled to an evidentiary hearing. An evidentiary hearing is allowed only where the petitioner can advance additional facts which, if true, would entitle him to relief. *Beaver v. Thompson*, 93 F.3d 1186, 1190 (4th Cir. 1996). Here, Emmett has advanced no such evidence.

Accordingly, the respondent's Motion to Dismiss must be GRANTED and the petitioner's Petition for a Writ of Habeas Corpus must be DISMISSED. Given this holding, the petitioner's Motion for Appointment of Mental Health Expert, filed on November 20, 2005, must also be DENIED as moot.

An appropriate order shall issue this day.

ENTERED: _Norman K Moon_
U.S. District Judge
_February 27, 2006_
Date

36